**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | | |
|---|---|---|
| MAGGIE ROHAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No. _____ |
| | ) | |
| SAINT LUKE'S HEALTH SYSTEM, INC. | ) | |
| THE SAINT LUKE'S HEALTH SYSTEM | ) | |
| RETIREMENT COMMITTEE and | ) | |
| JOHN and JANE DOES 1-25 | ) | |
| | ) | |
| Defendants. | ) | |

**COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT**
**INCOME SECURITY ACT OF 1974, AS AMENDED (ERISA)**

## I.  INTRODUCTION

1.      Plaintiff Maggie Rohan, individually and on behalf of a class of similarly situated participants ("Plaintiff") in the Saint Luke's 403(b) Plan (the "Plan"), and on behalf of the Plan, brings this action for breach of fiduciary duty and prohibited transactions under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), against Saint Luke's Health System, Inc. ("Saint Luke's"), the St. Luke's Health System Retirement Committee (the "Committee"), and Jane and John Does 1–25, the individual members of the Committee during the proposed class period ("Defendants").

2.      The Plan is a defined contribution plan for Saint Luke's employees to save for their retirements.  Most fees assessed to participants in a defined contribution plan are attributable to two general categories of services: plan administration (including recordkeeping), and investment management. Fiduciaries of defined contribution plans must engage in a rigorous process to control these costs to ensure that participants pay no more than a reasonable level of fees. This is

particularly true for large plans, like the Plan, which have the bargaining power to obtain the highest level of service at the best price.

3.    Throughout the Class Period (defined below), Defendants allowed the Plan's recordkeeper, Transamerica, to receive excessive and unreasonable compensation through: (1) direct, "hard dollar," fees the Plan paid to Transamerica; (2) indirect, "soft dollar," fees paid by non-Transamerica managed mutual funds; (3) fees paid to Transamerica from Transamerica-managed investments; and (4) float interest, freedom to market rollover-materials to Plan participants, and other forms on indirect compensation.

4.    To provide for these revenue streams, Defendants larded the Plan with excessively expensive mutual funds — to the exclusion of superior alternatives — which paid Transamerica from the excessive fees they charged the Plan and its participants.

5.    In nearly all instances, the investment options that Defendants chose for the Plan charged higher fees than comparable alternatives offered by the same investment managers with the same investment strategy, differentiated solely by their lower fee.

6.    The Plan's investment options collectively underperformed superior alternative funds for a variety of reasons, including the fact these alternative charged lower fees since they did not make additional payments to Transamerica.

7.    In addition to selecting underperforming investment options with excessive fees, Defendants also caused the Plan to pay Transamerica too much for recordkeeping services given the number of Plan participants and the level of the Plan's investments.  These expenses were ultimately bore by Plan participants, further reducing their retirement savings. Moreover, the Plan's recordkeeper expenses (paid ultimately by Plan participants) were far greater than for St.

Luke's defined benefit pension plan, which Saint Luke's paid, even though Transamerica performed the same recordkeeping functions for both plans.

8.      Although Defendants begin to reduce these excessive fees by moving Plan assets into less expensive (and often otherwise identical) investment alternatives and replacing Transamerica as the Plan's recordkeeper, they did not do so until 2018, after the Plan and its participants paid these excessive fees for years.

9.      Plaintiff brings this action by and through her undersigned attorneys based upon her personal knowledge and information obtained through counsel's investigation. Plaintiff anticipates that discovery will uncover further substantial support for the allegations in this Complaint.

## II.    NATURE OF THE ACTION

10.      Under ERISA, the obligations that retirement plan fiduciaries owe to the plan's participants  and beneficiaries are "the highest known to the law." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598, 602  (8th Cir. 2009).

11.      When selecting investments for a retirement plan, plan fiduciaries are required to: perform with undivided loyalty; act prudently; and defray reasonable plan expenses. ERISA §404(a)(1), 29 U.S.C. §1104(a)(1).

12.      Defendants, who during the Class Period are or were fiduciaries of the Plan, have violated their fiduciary duties owed to the Plan and its participants, including Plaintiff.

13.      Defendants, during the Class Period, were responsible for selecting, monitoring, and removing the Plan's investment options and the Plan's recordkeeper. The individual Defendants were officers or employees of Saint Luke's. Instead of acting for the exclusive benefit of the Plan and its participants and beneficiaries when performing these duties, Defendants forced

3

the Plan into investments that charged excessive fees that benefitted Transamerica at the expense of the Plan.

14.     This class action is brought on behalf of participants in the Plan who participated from March 10, 2014 through December 31, 2017 (the "Class Period").

## III.     JURISDICTION AND VENUE

15.     **Subject Matter Jurisdiction.** This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 because it is a civil action arising under the laws of the United States, and pursuant to ERISA §502(e)(1), 29 U.S.C. §1132(e)(1).

16.     **Personal Jurisdiction.** This court has personal jurisdiction over each of the Defendants because they reside and/or transact business in and have significant contacts with this District, and because ERISA provides for nationwide service of process, ERISA §502(e)(2), 29 U.S.C. §1132(e)(2), and the Plan is and was administered in this District and the breaches of ERISA took place herein. This Court also has personal jurisdiction over Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would be subject to the jurisdiction of a court of general jurisdiction in Missouri.

17.     **Venue.** Venue is proper in this District pursuant to ERISA §502(e)(2), 29 U.S.C. §1132(e)(2), because the Plan is and was administered in Kansas City, Missouri, which is within this District, the breaches of ERISA took place in this District, and several defendants, including Saint Luke's and the Committee reside or may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. §1391 because a defendant resides and/or does business in this District and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## IV.    PARTIES

18.    Plaintiff Maggie Rohan is a resident of Lees Summit, Missouri. She participated in the Plan during the entire Class Period.

19.    Plaintiff's individual account in the Plan was invested in the American Century One Choice 2050 Target Date Fund throughout the Class Period. Plaintiff, like substantially all Plan participants and beneficiaries, was not provided any information regarding the substance of Defendants' deliberations, if any, concerning the Plan's menu of investment options or selection of service providers during the Class Period. Plaintiff lacked knowledge of Transamerica's revenue sharing relationships, the existence of, and Plan's qualification for, less expensive, yet substantively identical, investment alternatives, or the reasonable rates for large defined contribution plan recordkeeping services. Plaintiff also lacked knowledge that Transamerica's recordkeeping relationship for the defined benefit plan (where expenses are ultimately borne by Saint Luke's) was far below the fees Transamerica received for recordkeeping the Plan. Plaintiff otherwise had no knowledge of the substance of the deliberations, or of the nature of the investments offered in the Plan beyond what was provided to her by the Plan. Plaintiff discovered her claims shortly before commencing this action.

20.    Defendant, Saint Luke's, is the Plan's Sponsor. It is a health care system operating 20 hospitals, 13 "Convenient Care Clinics" and several labs, pharmacies, physician practices, surgery centers, and walk-in clinics across the Kansas City area, located in both Kansas and Missouri, with its principal place of business in Kansas City, Missouri.

21.    Defendant, St. Luke's Health System Retirement Committee ("the Committee"), is comprised of employees of Saint Luke's. The Committee has the authority to determine the

5

investment funds made available under the Plan and to develop and oversee the implementation of any investment education program.

22.    Defendants Jane and John Does 1–25 are members of the Committee and/or Saint Luke's executives in charge of Human Resources during the Class Period, who are unknown to Plaintiff.

23.    Defendants are, or during the Class Period were, fiduciaries to the Plan within the meaning of ERISA §§ 3(21)(A)(i) and (iii), 29 U.S.C. §§ 1002(21)(A)(i) and (iii), and parties in interest to the Plan within the meaning of ERISA §§ 3(14)(A) and (C), 29 U.S.C. §§ 1002(14)(A) and (C).

V.    FACTS

    A.    The Plan and its Administration.

24.    The Plan is an employee benefit plan within the meaning of ERISA §3(3), 29 U.S.C. §1002(3), which is subject to the provisions of Title I of ERISA pursuant to ERISA §4(a), 29 U.S.C. §1003(a).

25.    The Plan is also an "employee pension benefit plan" or "pension plan" as defined by ERISA §3(2)(A), 29 U.S.C. §1002(2)(A), and "defined contribution plan" or "individual account plan" within the meaning of ERISA §3(34), 29 U.S.C. §1002(34).

26.    The Plan covers eligible employees of Saint Luke's.

27.    Saint Luke's is the Plan Administrator. Accordingly, it is responsible for selecting, monitoring, and removing the investment options in the Plan. At some or all times during the Class Period, it delegated some or all of these responsibilities to the Committee and its members. The Committee's individual members are employees and officers of Saint Luke's.

6

28.     Plan participants have their own accounts to which they may contribute a portion of the compensation they earn from their employment at Saint Luke's. Saint Luke's also has the discretion to make matching contributions. Participants can direct the investment of the assets allocated to their individual accounts into the investment options approved by the Committee and offered by the Plan, and the return on those investments are credited to each participant's account. Participants who do not direct the investment of the assets are invested in the Plan's default investment option, the American Century target date funds, which paid revenue sharing to Transamerica during the entire Class Period.

29.     During the Class Period, the Plan has invested in approximately 30 different investment options, of which all but 2 were managed by Transamerica or paid Revenue Sharing to Transamerica.

30.     The Plan's most recent Form 5500 filing with the U.S. Department of Labor states that at the end of the 2018 plan year the Plan had 12,849 participants with account balances.

31.     Transamerica served as the Plan's Recordkeeper for the entirety of the Class Period, but was replaced with Fidelity at the end of 2017, the close of the Class Period.

32.     Following the switch to Fidelity, the Plan's recordkeeping costs dropped dramatically and several of the Plan's investment options were moved into less expensive share classes of identical funds. Currently, the Plan has no investments managed by Transamerica and, upon information and belief, does not invest in any core investments providing revenue sharing to Fidelity.

33.     The Recordkeeper of a defined contribution plan, like the Plan, maintains participant account balances, provides a website and telephone number for Plan Participants to monitor and control their Plan accounts, and provides various other services to the Plan.

34.     These services are highly commoditized, with little or nothing distinguishing the services provided by one recordkeeper over another.

35.     The cost of providing these services depends on the number of participants, not on the amount of money in participants' accounts. The cost of providing recordkeeping services to a participant with $200,000 in her retirement account is the same as for a participant with $1,000 in her retirement account. Plans with large numbers of participants can take advantage of economies of scale to negotiate a much lower per-participant fee for recordkeeping services compared to smaller plans.

36.     Because recordkeeping costs are not affected by account size, prudent fiduciaries negotiate recordkeeping fees on the basis of a fixed dollar amount for each participant in the plan, instead of a percentage of plan assets. Otherwise, as plan assets increase (such as through participant contributions and investment gains), recordkeeping compensation increases without any change in recordkeeping services. Indeed, that pattern is shown across the Class Period here.

37.     For providing various services, third-party plan administrators, record-keepers, consultants, investment managers, and other vendors in the 401(k) industry have developed a variety of pricing and fee structures.

38.      At best, these fee structures are complicated and confusing when disclosed to Plan participants. At worst, they are excessive, undisclosed, and illegal.

39.     The compensation Transamerica received for its recordkeeping and administration of the Plan was excessive and unreasonable, and the Defendants breached their fiduciary obligations under 29 U.S.C. §1104(a) to ensure that Transamerica only received reasonable compensation.

40.     The Committee also failed to have a prudent process for evaluating the amount and reasonableness of Transamerica's compensation. Instead of evaluating the cost of these services in the marketplace, the Committee permitted Transamerica to administer and serve as the recordkeeper for the Plan without meaningful market competition. At no time before December 31, 2017, did Defendants limit or curtail Transamerica's growing compensation. Rather, Defendants allowed Transamerica to generate ever higher fees even though market rates for recordkeeping services dropped during the same time period.

41.     Defendants' failure to control the Plan's excessive expenses constituted a breach of the duties of prudence in violation of 29 U.S.C. §1104(a) and cost the Plan millions of dollars in excessive fees charged directly by Transamerica or collected by Transamerica from the Plan's investment options through revenue sharing.

42.     Pursuant to 29 U.S.C. §1109, the Defendants are personally liable to make good to the Plan any losses to the Plan resulting from this breach, as well as any other equitable or remedial relief the Court deems appropriate.

**B.      Transamerica's Sources of Compensation**

43.     Defendants caused the Plan to purchase recordkeeping, administration, investment management, and other services from various institutions and entities. The fees paid to Transamerica were unreasonable and excessive, especially in light of the Plan's significant size.

44.     Defendants caused the amounts that the Plan paid for these services to be assessed against Plan participants' accounts.

45.     Defendants caused or allowed Transamerica to receive payment in at least four ways:

        a.      By direct disbursement from the Plan to the entity providing the service;

b.     By receiving, or having the opportunity to receive, "Revenue Sharing" payments from Plan investments distributed between or among various service providers;

c.     By profiting from the inclusion of the proprietary Transamerica-managed mutual fund known as Transamerica Stock Index, which charged excessive fees to all investors, including the Plan; and

d.     Through other sources of compensation, including float interest and access to plan participants for marketing purposes.

### i.     "Hard Dollar" Payments to Transamerica

46.     Payments in the form of direct disbursements from the Plan to an entity providing a service to the Plan are characterized as "Hard Dollar" payments or "Direct Compensation."

47.     Plan Sponsors, like Saint Luke's, generally disclose to government regulators the amount and nature of the Hard Dollar payments made from a plan to the plan's service providers.

48.     When such disclosures are made, understanding a plan's service provider expenses for a given year *appears* straightforward: the plan transfers funds in a stated amount in return for the provider's services. From this, plan participants and government regulators reviewing the disclosures could tell how much a plan paid for each service.

49.     Transamerica received the following Hard Dollar payments from the Plan according to forms filed by the Plan with the United States Department of Labor.

| Year | Hard-Dollar Payments |
|------|---------------------|
| 2013 | $620,116 |
| 2014 | $955,131 |
| 2015 | $941,231 |

| 2016 | $999,606 |
|------|----------|
| 2017 | $1,068,089 |

**ii.      Revenue Sharing Payments to Plan Service Providers**

50.      In addition to these Hard Dollar payments, most of Transamerica's compensation came in the form of Revenue Sharing.

51.      Industry commentators and analysts consider Revenue Sharing as the "big secret of the retirement industry."

52.      Revenue Sharing is the transfer of asset-based compensation from brokers or investment management providers (such as mutual funds, common collective trusts, insurance companies offering general insurance contracts, and similar pooled investment vehicles) to administrative service providers (record-keepers, administrators, trustees) in connection with 401(k) and other types of defined contribution plans.

53.      For example, a plan or its agent (e.g., a third-party administrator, consultant, or similar fiduciary) seeking to invest plan assets in an investment vehicle (e.g., a mutual fund, common and collective trust, guaranteed investment contract, etc. (collectively a "Fund")) will negotiate the costs assessed against each dollar invested by specifying the expense ratio and available Revenue Sharing (which is included within the expense ratio).

54.      In Revenue Sharing arrangements, the plan and the Fund agree upon an asset-based fee (i.e., an expense ratio) that is not the true price for which the Fund will provide its service.

55.      Instead, the agreed asset-based fee includes ***both*** the actual price for which the Fund will provide its service ***and*** additional amounts that the Fund does not need to cover the cost of its services and to make a profit.

56.     The additional portion of the agreed-upon asset-based charge is "shared" with plan service providers or others who do business with the plan or the Fund.

57.     As a result of Revenue Sharing arrangements, plan service providers or others who do business with the plan or the Fund receive *both* a Hard Dollar payment from the plan *and* additional revenue that the Fund "shares" with them.

58.     The total fees a Fund charges to a plan can vary widely based upon a number of factors, including without limitation:  the amount that the plan invests in the Fund; the level of sophistication of the plan fiduciary negotiating the fee agreement; the plan fiduciary's awareness of Revenue Sharing and effort to monitor revenue sharing transfers; the diligence with which the plan fiduciary conducts such negotiations; and the separate financial interests and/or agendas of the plan fiduciary and the Fund as they negotiate.

59.     To severely reduce, or eliminate Hard Dollar payments altogether, a plan's fiduciaries and a Fund may agree to set a Fund's asset-based fee (its expense ratio) at a level high enough: (A) to cover the Fund's services and profit; and (B) to provide excess Revenue Sharing more than sufficient to cover all other Plan services *and more*. This causes a plan's recordkeeping fees to appear deceptively low in disclosures to Plan participants and government regulators.

60.     When Plan service providers receive compensation in the form of both Hard Dollar fees *and* Revenue Sharing payments determining the total amount of fees and expenses that the Plan incurs for any category of services (*i.e.* recordkeeping and administration, investment advisory, trustee, auditing, etc.) requires that *both* the Hard Dollar fees *and* Revenue Sharing payments be taken into account.

61.     A prudent fiduciary ensures that the plan's recordkeeper rebates to the plan all revenue sharing payments that exceed a reasonable, flat per-participant recordkeeping fee that can

be obtained from the recordkeeping market through competitive bids. Because revenue sharing payments are asset-based, they can bear no relation to a reasonable recordkeeping fee and, if not managed, can provide excessive compensation, as they did during the Class Period.

62.     Although Revenue Sharing monies arise only as a result of, and in connection with, transactions involving the Plan, plan assets, and service providers; Revenue Sharing is not always captured and used for the benefit of the Plan and the participants.

63.     In addition, plan fiduciaries may limit their selection of funds to only those funds which provide sufficient revenue sharing, thus foregoing superior investment alternatives and selecting or maintaining inferior investment options based upon revenue sharing relationships. These alternatives include identical share classes of the same mutual funds that charged lower fees because they do not pay revenue sharing, institutional products by the same fund managers which offer materially identical services for even lower cost, or superior alternatives offered by different managers who are unwilling to pay revenue sharing to the Plan recordkeeper.

64.     Plan fiduciaries may do this to conceal the true amount of compensation paid to the Recordkeeper or to reduce the plan sponsor's cost at the expense of plan participants.

65.     Throughout the Class Period, the Plan offered more at least 20 investment options, all but five of which were actively managed and paid revenue sharing to Transamerica.[1]

66.     In determining whether a Plan Administrator or other fiduciary has fulfilled its obligation to ensure that the fees and expenses assessed against the Plan are reasonable and incurred solely in the interest of Plan participants, all sources of compensation, including revenue sharing, must also be taken into account.

---

[1] The Plan included five passively managed mutual funds, one of which was managed by Transamerica and, therefore, provided compensation to Transamerica without the need for revenue sharing arrangements.

67.     Adding revenue sharing from non-Transamerica mutual funds to the Hard Dollar fees discussed above, Transamerica's compensation from external, non-Transamerica funds, were:

| Year | Hard-Dollar Payments | Non-Proprietary Revenue Sharing | External Compensation |
|------|---------------------|--------------------------------|----------------------|
| 2014 | $955,131 | $718,068 | $1,673,199 |
| 2015 | $941,231 | $794,419 | $1,735,650 |
| 2016 | $999,606 | $919,180 | $1,918,786 |
| 2017 | $1,068,089 | $1,131,579 | $2,199,668 |

**iii.    Proprietary Revenue Sharing on Transamerica Stock Index Fund**

68.     In addition to non-Transamerica funds paying revenue sharing to Transamerica, the Plan included the Transamerica Stock Index Fund. The objective of that Fund is to "match the performance of the S&P 500," meaning that it seeks to replicate the index's performance rather than exceed it — a management strategy commonly referred to as "passive management."

69.     The fees this Fund charged to Plan Participants were 0.30% (30 bps).

70.     Although Transamerica did not technically need to name payments from this option "Revenue Sharing," Transamerica benefitted from the Defendants' selection of this option for the Plan.

71.     Upon information and belief, Defendants chose this option at the request of Transamerica, and not because it was in the best interest of the Plan or the Plan's participants and beneficiaries. Indeed, other index funds available to large defined contribution plans had established histories doing a better job of tracking the S&P 500 Index, and at lower cost.

72.     The fees for the Transamerica Stock Index Fund in the Plan, compared to available alternatives with identical investment goals — to track the S&P 500 Index— was:

| Manager | Ticker Symbol | Fees |
|---|---|---|
| Transamerica | TSTFX | 30.0 bps[2] |
| Fidelity | FXAIX | 1.5 bps |
| Vanguard | VINIX | 3.5 bps |
| Schwab | SWPPX | 2.0 bps |

73.     Accordingly, the Transamerica Fund in the Plan was over 10 times more expensive than comparable alternative funds tracking the same index using the same strategy. As a result, the Plan pay over $200,000 more in management fees in that Transamerica Fund alone than it would have using a prudent index fund that would not have benefitted Transamerica.

74.     While the amount of internal revenue sharing was never disclosed, these excessive payments were additional excessive compensation to Transamerica.

C.     **Excessive Recordkeeping Fees**

75.     Recordkeeping is a service necessary for every defined contribution plan. The market for recordkeeping services is highly competitive. There are numerous recordkeepers in the marketplace who are equally capable of providing a high level of service to a large defined contribution plan like the Plan. These recordkeepers primarily differentiate themselves based on price, and vigorously compete for business by offering the best price.

---

[2] A basis point (bp) is equal to 0.01%, so a fee of 30 bps means 0.3% of the fund's assets are paid by the Fund each year.

76.     The cost of recordkeeping services depends on the number of participants, not on the amount of assets in the participant's account. Thus, the cost of providing recordkeeping services to a participant with a $100,000 account balance is the same for a participant with $1,000 in her retirement account. For this reason, prudent fiduciaries of defined contribution plans negotiate recordkeeping fees on the basis of a fixed dollar amount for each participant in the plan rather than as a percentage of plan assets. Otherwise, as plan assets increase through participant contributions or investment gains, the recordkeeping compensation increases without any change in the recordkeeping and administrative services.

77.     Large defined contribution plans, like the Plan, experience economies of scale for recordkeeping and administrative services. As the number of participants in the plan increases, the per-participant fee charged for recordkeeping and administrative services decline. These lower administrative expenses are readily available for plans with a greater number of participants.

78.     Average 401(k) Plan Recordkeeping Fees have been summarized as follows:[3]

| Number of Participants | Costs Per Participant |
| --- | --- |
| 200 | $42 |
| 500 | $37 |
| 1,000 | $34 |

79.     Nearly all of the Plan's investment options made Revenue Sharing payments with the Plan's recordkeeper, Transamerica.

---

[3] "Study of 401(k) Plan Fees and Expenses", Pension and Welfare Benefits Administration (April 13, 1998).

80. Form 5500s filed by the Plan with the United States Department of Labor show that during the Class Period Transamerica received the much of its compensation for recordkeeping the Plan from asset-based Revenue Sharing.

81. Because Revenue Sharing arrangements provide asset-based fees, prudent fiduciaries monitor the amount that a recordkeeper receives — as well as other compensation such as interest earned on assets moving into and out of the Plan, called "float" — to ensure that the record-keeper is not receiving unreasonable compensation.

82. Assuming that only 25 basis points of the fees charged on the proprietary Transamerica fund, and no value from Transamerica's access to participant and Plan information to cross-sell other products, the combined Hard-Dollar, non-proprietary Revenue Sharing (External Compensation from Paragraph 67), and proprietary fees for internal Revenue sharing to Transamerica totaled:

| Year | Total Recordkeeping Fee | Per-Participant RK Fee |
|---|---|---|
| 2014 | $1,713,725 | $160.15 |
| 2015 | $1,778,273 | $163.43 |
| 2016 | $1,971,355 | $169.27 |
| 2017 | $2,267,981 | $179.59 |

83. Market prices for large plans like the Plan (i.e., plans with more than $250 million in assets) are typically considerably lower because of available economies of scale and the bargaining power exerted by prudent fiduciaries. *See, Tussey v. ABB, Inc*., 2012 WL 1113291, *11 (W.D.Mo. 2012) (determining after a trial that recordkeeping fees of around $100 per participant per year were excessive for a plan with 12,567 participants), vacated in part but affirmed as to recordkeeping at 746 F.3d 327 (8th Cir. 2014).

84.     To ensure that plan administrative expenses are reasonable, prudent fiduciaries of large defined contribution plans, such as the Plan, put plan recordkeeping and administrative services out for competitive bidding at regular intervals of around three years.

85.     This is further supported by the Plan's retention of Fidelity to record keep the Plan beginning in 2018. Fidelity receives $76 per participant per year through a Hard Dollar fee, no revenue sharing from core options, and only *de minimus* level of revenue sharing by virtue of a "brokerage window," which Fidelity offers in order to allow participants access to a far broader set of investment alternatives. Before moving to Fidelity, the brokerage window was offered by a third-party, Charles Schwab, who was also compensated through comparable revenue sharing on brokerage window investments for that added service.

86.     Taking into account the administrative services required by the Plan and provided by Transamerica, the Plan's participant level, and the market rates for these services, the outside limit of a reasonable recordkeeping fee for the Plan would have been $76 per participant.

87.     Thus, Transamerica received (at the Plan's expense) 2–3 times more than the maximum fee a prudent fiduciary would have allowed for the services provided.

88.     Defendants also failed to control recordkeeping costs as the Plan's assets grew as a result of market appreciation and participants' contributions. Because revenue sharing payments were a significant portion of Transamerica's compensation and are asset-based, per-participant recordkeeping fees grew as the Plan's assets increased during the Class Period.

| Year | Amount of Excessive Fees to Transamerica above $76/participant |
|------|----------------------------------------------------------------|
| 2014 | $910,252 |
| 2015 | $962,503 |
| 2016 | $1,097,634 |

| 2017 | $1,323,874 |
|---|---|
| **Total** | **$4,292,263** |

89.     These damages do not reflect the opportunity cost to the Plan of having excessive fees deducted in each year. Had the excessive fees paid to Transamerica instead remained in the Plan, and been invested in identical, lower cost share classes through the present, the Plan would have significantly more than $4.3 million in additional assets.

**D.      Defendants' Imprudent Selection and Retention of Options Paying Fees to Transamerica**

90.     To facilitate revenue sharing and the proprietary Transamerica Fund in the Plan, Defendants maintained investment options despite no expectation they would outperform cheaper or superior alternatives. While Plaintiff lacks knowledge of Defendants' fiduciary selection process, a long series of decisions involving proprietary and non-proprietary investments indicate a failure by Defendants to prudently select and monitor the investment options in the Plan.

**i.      Alternatives with Lower-Cost and Better Prospects for Future Performance Were Available for the Plan**

91.     Large retirement plans, like the Plan, have substantial bargaining power to negotiate low fees for investment management services.

> The fiduciaries also must consider the size and purchasing power of their plan and select the share classes (or alternative investments) that a fiduciary who is knowledgeable about such matters would select under the circumstances. In other words, the 'prevailing circumstances'—such as the size of the plan—are a part of a prudent decision-making process. The failure to understand the concepts and to know about the alternatives could be a costly fiduciary breach.

Fred Reish, *Just Out of Reish: Classifying Mutual Funds*, Plan Sponsor Magazine (Jan. 2011).[4]

92.    Mutual funds frequently offer multiple share classes of the same mutual fund. Because the only difference between the share classes is cost, a prudent investor will select the lowest cost option, because doing so saves money.

93.    Lower-cost institutional share classes of mutual funds are available to institutional investors, like the Plan, that meet the minimum investment amounts for these share classes. In addition, large retirement plans can invest in collective investment trusts or hire investment advisers directly to manage separate accounts for the plan within plan-specific investment parameters and with even lower investment management fees.

94.    Despite these lower-cost options, Defendants have invested, and continue to invest, Plan assets in mutual funds with a higher cost than were and are available for the Plan based on its size, such as separate accounts and collective trusts.

95.    For the *exact same mutual fund option*, the Plan has offered higher-cost share classes of *identical* mutual funds than were available to the Plan, without prudently considering these lower-cost identical alternatives or recapturing the excessive fees for the benefit of the Plan.

96.    The lower-cost identical mutual funds to the Plan's investments include and have included nearly every mutual fund selected and maintained in the Plan by Defendants. These include the following:

| Plan Mutual Fund | Plan Fee | Plan Assets (2016)[5] | Identical Lower-Cost Mutual Fund Share Class | Identical Lower-Cost Mutual Fund Fee Savings |
|---|---|---|---|---|
| Alliance Bernstein Large Cap Value | 95 bps | $23,118,843 | R6 | 37 bps |

---

[4] Available at http://www.plansponsor.com/MagazineArticle.aspx?id=6442476537.

[5] Plan Assets are identified based on the Plan's 2015 Form 5500 filing with the U.S.

| Plan Mutual Fund | Plan Fee | Plan Assets (2016)[5] | Identical Lower-Cost Mutual Fund Share Class | Identical Lower-Cost Mutual Fund Fee Savings |
|---|---|---|---|---|
| Alliance Bernstein Small Cap Value | 81 bps | $90,59133 | R6 | 3 bps |
| American Century One Choice Target Date Funds | 57–71 bps | $91,799,940 | R6 | 15 bps |
| American Funds EuroPacific | 84 bps | $12,397,975 | R6 | 25 bps |
| Dreyfus Bond Index | 40 bps | $12,819,177 | I | 25 bps |
| Dreyfus Midcap Index | 50 bps | $27,671,622 | I | 25 bps |
| Dreyfus Small Cap Stock Index | 50 bps | $18,860,851 | I | 25 bps |
| Invesco Equity and Income | 53 bps | $23,778,416 | R6 | 14 bps |
| MFS Int'l Value | 73 bps | $5,591,641 | R6 | 10 bps |
| PIMCO Total Return | 80 bps | $19,562,151 | Inst. | 34 bps |
| Principal Diversified Real Asset | 85 bps | $6,892,689 | R6 | 6 bps |
| Principal High Yield | 61 bps | $7,999,733 | R6 | 9 bps |
| Principal Large Cap Growth | 97 bps | $12,723,480 | R6 | 38 bps |
| T.Rowe Price New Horizons | 77 bps | $12,976,657 | I | 12 bps |

97.     As shown above, the Plan paid fees significantly higher fees than they should have paid for the *identical* mutual fund products.

98.     The failure to select lower-cost share classes for the Plan's mutual fund options identical in all respects (portfolio manager, underlying investments, structure, and asset allocation) except for cost demonstrates that either Defendants intentionally refused to move the Plan to a cheaper share class, or that it failed to consider the size and purchasing power of the Plan when selecting share classes and engaged in no prudent process in the selection, monitoring, and

Department of Labor. Fees and alternative share classes are reported according to Morningstar.com.

retention of those mutual funds. Either explanation constitutes a violation of Defendants' fiduciary obligations to the Plan. *Tibble v. Edison Int'l*, 843 F. 3d 1187, 1198 (9th Cir. 2016) ("[A] trustee cannot ignore the power the trust wields to obtain favorable investment products, particularly when those products are substantially identical — other than their lower cost — to products the trustee has already selected.").

99.     Had the amounts invested in the higher-cost share class mutual fund options instead been invested in the lower-cost share class mutual fund options from February 28, 2014 to December 31, 2017, Plan participants would have retained over $1 million more in their retirement savings, which would have grown even larger because it would have remained invested in the Plan.

100.     The high investment management, recordkeeping, and other administrative fees caused the Plan to incur Total Plan Costs — the total percentage of the Plan's assets paid in fees each year — that were more than double what comparable plans paid.

101.     The Investment Company Institute, an industry trade group, reports that the average participant in a plan with $250 million to $500 million in assets paid a Total Plan Cost of 46 bps. in 2015. The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2015. [available at: https://www.ici.org/pdf/ppr_18_dcplan_profile_401k.pdf]. However, the Total Plan Cost paid by participants in this Plan in 2015 was 94 bps. Thus, whether measured by compensation to Transamerica, the expense ratios of Plan investment options, or the Total Plan Cost, Defendants caused the Plan to pay more than twice the reasonable fee levels for the services provided.

## VI.     ERISA'S FIDUCIARY STANDARDS

102.     ERISA imposes strict fiduciary duties of loyalty and prudence upon Defendants as fiduciaries of the Plan. ERISA § 404(a), states, in relevant part, that:

[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and —

> (A)    for the exclusive purpose of:
>
> > (i)    providing benefits to participants and their beneficiaries; and
> >
> > (ii)   defraying reasonable expenses of administering the plan; [and]
>
> (B)    with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims;
>
> (C)    by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so[.]

103.    ERISA also imposes co-fiduciary duties on plan fiduciaries. ERISA § 405, 29 U.S.C. § 1105, states in relevant part that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> > (1)    if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;
> >
> > (2)    if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
> >
> > (3)    if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

104.    Under ERISA, fiduciaries who exercise discretionary authority or control over the selection of plan investments and the selection of plan service providers must act prudently and solely in the interest of participants and beneficiaries of the plan when performing such functions. Thus, "the duty to conduct an independent investigation into the merits of a particular investment" is "the most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litig.*, 74 F.3d 420, 435 (3d Cir. 1996).

105. As the Department of Labor explains,

> [T]o act prudently, a plan fiduciary must consider, among other factors, the availability, riskiness, and potential return of alternative investments for his or her plan. [Where an investment], if implemented, causes the Plan to forego other investment opportunities, such investments would not be prudent if they provided a plan with less return, in comparison to risk, than comparable investments available to the plan, or if they involved a greater risk to the security of plan assets than other investments offering a similar return.

DOL Opinion 88-16A (1988).

106. Pursuant to these duties, fiduciaries must ensure that the services provided to the plan are necessary and that the fees are reasonable:

> Under section 404(a)(1) of ERISA, the responsible Plan fiduciaries must act prudently and solely in the interest of the Plan participants and beneficiaries … in determining which investment options to utilize or make available to Plan participants or beneficiaries. In this regard, the responsible Plan fiduciaries must assure that the compensation paid directly or indirectly by the Plan to [service providers] is reasonable.

DOL Opinion 97-15A (1997); DOL Opinion 97-16A (1997).

107. A fiduciary's duty of loyalty requires a fiduciary to act solely in the interest of plan participants and beneficiaries. As the Department of Labor has warned:

> [T]he Department has construed the requirements that a fiduciary act solely in the interest of, and for the exclusive purpose of providing benefits to participants and beneficiaries, as prohibiting a fiduciary from subordinating the interests of participants and beneficiaries in their retirement income to unrelated objectives. In other words, in deciding whether and to what extent to invest in a particular investment, or to make a particular fund available as a designated investment alternative, a fiduciary must ordinarily consider only factors relating to the interests of plan participants and beneficiaries in their retirement income. A decision to make an investment, or to designate an investment alternative, may not be influenced by non-economic factors unless the investment ultimately chosen for the plan, when judged solely on the basis of its economic value, would be equal to or superior to alternative available investments.

DOL Opinion 98-04A (1998); *see also* DOL Opinion 88-16A (1988).

109.    Additionally, the Department of Labor has repeatedly warned:

> While the law does not specify a permissible level of fees, it does require that fees charged to a plan be "reasonable." After careful evaluation during the initial selection, the plan's fees and expenses should be monitored to determine whether they continue to be reasonable.

*Meeting Your Fiduciary Responsibilities*, U.S. Dep't of Labor Employee Benefits Security Admin. (Feb. 2012), http://www.dol.gov/ebsa/publications/fiduciaryresponsibility.html.

110.    In a separate publication, the Department of Labor wrote:

> The Federal law governing private-sector retirement plans, the Employee Retirement Income Security Act (ERISA), requires that those responsible for managing retirement plans -- referred to as fiduciaries -- carry out their responsibilities prudently and solely in the interest of the plan's participants and beneficiaries. Among other duties, fiduciaries have a responsibility to ensure that the services provided to their plan are necessary and that the cost of those services is reasonable.

> \* \* \*

> Plan fees and expenses are important considerations for all types of retirement plans. As a plan fiduciary, you have an obligation under ERISA to prudently select and monitor plan investments, investment options made available to the plan's participants and beneficiaries, and the persons providing services to your plan. Understanding and evaluating plan fees and expenses associated with plan investments, investment options, and services are an important part of a fiduciary's responsibility. This responsibility is ongoing. After careful evaluation during the initial selection, you will want to monitor plan fees and expenses to determine whether they continue to be reasonable in light of the services provided.

> \* \* \*

> By far the largest component of plan fees and expenses is associated with managing plan investments. Fees for investment management and other related services generally are assessed as a percentage of assets invested. Employers should pay attention to these fees. They are paid in the form of an indirect charge against the participant's account or the plan because they are deducted directly from investment returns. Net total return is the return after these fees have been deducted. For this reason, these fees, which are not specifically

identified on statements of investments, may not be immediately apparent to employers.

*Understanding Retirement Plan Fees and Expenses*, U.S. Dep't of Labor Employee Benefits Security Admin. (Dec. 2011), http://www.dol.gov/ebsa/publications/undrstndgrtrmnt.html.

111.    ERISA §502(a)(3), 29 U.S.C. §1132(a)(3), provides a cause of action against a party in interest, such as St. Luke's, for participating in a breach of a fiduciary duty by an ERISA plan fiduciary.

112.    ERISA § 405(a), 29 U.S.C. §1105(a), provides a cause of action against a fiduciary, such as St. Luke's, for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty.

113.    ERISA § 409, 29 U.S.C. § 1109, provides, *inter alia*, that any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by Title I ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach and to restore to the plan any profits the fiduciary made through use of the plan's assets. ERISA § 409, 29 U.S.C. § 1109, further provides that such fiduciaries are subject to such other equitable or remedial relief as a court may deem appropriate.

## VII.    CLASS ACTION ALLEGATIONS

114.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), permits a plan fiduciary, participant, beneficiary, or the Secretary of Labor to bring a suit individually on behalf of the Plan to recover for the Plan the remedies provided under ERISA § 409, 29 U.S.C. § 1109(a).

115.    In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions

on behalf of the Plan under 29 U.S.C. § 1132(a)(2) and (3), Plaintiffs seek to certify this action as a class action on behalf of:

> All participants in the Plan from March 10, 2014 to December 31, 2017. Excluded from the class are Defendants, Defendants' beneficiaries, and Defendants' immediate families.

116.    Class certification is appropriate under Fed. R. Civ. P. 23(a) and (b)(1), (b)(2), and/or (b)(3).

(a)    The class satisfies the numerosity requirement of Rule 23(a) because it is composed of over ten thousand persons, in numerous locations. The number of class members is so large that joinder of all its members is impracticable.

(b)    The class satisfies the commonality requirement of Rule 23(a) because there are questions of law and fact common to the Class and these questions have common answers. Common legal and factual questions include, but are not limited to: (a) who are the fiduciaries liable for the remedies provided by ERISA § 409(a), 29 U.S.C. §1109(a); whether the fiduciaries of the Plan breached their fiduciary duties to the Plan by causing the Plan to invest in excessively expensive funds and by failing to prudently remove the funds from the Plan; whether the decision to include and not to remove a fund was made solely in the interests of Plan participants and beneficiaries; what are the losses to the Plan resulting from each breach of fiduciary duty; and what are the profits of any breaching fiduciary that were made through the use of Plan assets by the fiduciary.

(c)    The class satisfies the typicality requirement of Rule 23(a) because Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs'

claims, and the claims of all Class members, arise out of the same conduct, policies and practices of Defendants as alleged herein, and all members of the Class are similarly affected by Defendants' wrongful conduct. Plaintiff was and remains an investor in the Plan for the entirety of the Class Period.

(d)    The class satisfies the adequacy requirement of Rule 23(a). Plaintiff will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiff has no interests antagonistic to those of other members of the Class. Plaintiff is committed to the vigorous prosecution of this action and anticipates no difficulty in the management of this litigation as a class action.

(e)    Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would  substantially impair or impede their ability to protect their interests.

(f)    In the alternative, certification under Rule 23(b)(2) is warranted because Defendants acted or refused to act on grounds generally applicable to the Class, thereby making  appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

28

(g)    In the alternative, certification under Rule 23(b)(3) is appropriate because questions of law or fact common to members of the Class predominate over any questions affecting only individual members, and class action treatment is superior to the other available methods for the fair and efficient adjudication of this controversy.

## VIII.  CLAIMS FOR RELIEF

### a.    Count I - Breach of Fiduciary Duties in Connection with Investments

117.    Plaintiff repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

118.    Defendants are responsible for selecting, monitoring, and removing investment options in the Plan.

119.    Defendants caused the Plan to invest hundreds of millions of dollars in imprudent investment options, many of which were more expensive than prudent alternatives, unlikely to outperform their benchmarks, and laden with excessive fees which facilitated revenue-sharing payments back to Transamerica.

120.    Defendants failed to remove the funds even though a prudent fiduciary would have done so given the high fees, poor performance prospects, and availability of lower-cost alternatives.

121.    By the conduct and omissions described above, Defendants failed to discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the Plan, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A).

122.    Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims, in violation of ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

123.    As a direct and proximate result of these breaches of fiduciary duties, the Plan and its participants have paid, directly and indirectly, substantial excess investment management and other fund-related fees during the Class Period, and suffered lost-opportunity costs which continue to accrue, for which Defendants are jointly and severally liable pursuant to ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2).

**b.    Count II - Breach of Fiduciary Duty in Connection with Recordkeeping Fees and Total Plan Costs**

124.    Plaintiff repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

125.    Defendants are responsible for selecting, monitoring, negotiating with and removing the Plan's Recordkeeper.

126.    Defendants caused the Plan to pay, directly or indirectly, millions of dollars in excessive recordkeeping compensation to Transamerica during the Class Period. Transamerica's compensation, and the Total Plan Costs, were excessive and unreasonable given the services provided.

127.    Defendants failed to monitor and control these costs despite lower-cost Recordkeeping alternatives.

128.    By the conduct and omissions described above, Defendants failed to discharge their duties with respect to the Plan solely in the interest of the  participants and beneficiaries and for

the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the Plan, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A).

129. Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims, in violation of ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

130. As a direct and proximate result of these breaches of fiduciary duties, the Plan and its participants have paid, directly and indirectly, substantial excess fees during the Class Period, and suffered lost-opportunity costs which continue to accrue, for which Defendants are jointly and severally liable pursuant to ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2).

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

A.    A declaration that the Defendants breached their fiduciary duties under ERISA § 404;

B.    An order compelling the Defendants to restore all losses to the Plan arising from Defendants' violations of ERISA, including lost-opportunity costs;

C.    An order granting equitable restitution and other appropriate equitable monetary relief against Defendants;

D.    Such other equitable or remedial relief as may be appropriate, including the permanent removal of Defendants from any positions of trust with respect to the Plan and the appointment of independent fiduciaries to administer the Plan;

E.    An order certifying this action as a class action, designating the Class to receive the amounts restored or disgorged to the Plan, and imposing a constructive trust for distribution of those amounts to the extent required by law;

F.    An order enjoining Defendants collectively from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

G.    An order awarding Plaintiff and the Class their attorneys' fees and costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g), and/or the Common Fund doctrine, and post-judgment interest; and

H.    An order awarding such other and further relief as the Court deems equitable and just.

Dated: March 10, 2020            Respectfully submitted,

*/s/ Kristie Blunt Welder*
Kristie Blunt-Welder (MO Bar 61715)
Welder Blunt Welder & Associates, LLC
4741 Central St., Suite 514
Kansas City, Mo 64112
(844) 935-3373
kwelder@welderfirm.com

Mark G. Boyko (pending *pro hac vice*)
mboyko@baileyglasser.com
Bailey & Glasser LLP
8012 Bonhomme Avenue, Suite 300
Clayton, MO 63105
Telephone: (314) 863-5446
Facsimile: (314)-863-5483

Gregory Y. Porter (pending *pro hac vice*)
Alexandra L. Serber (pending *pro hac vice*)
**BAILEY & GLASSER LLP**
1054 31st Street, NW, Suite 230
Washington, DC 20007
(202) 463-2101
(202) 463-2103 fax
gporter@baileyglasser.com
aserber@baileyglasser.com

Dougles P. Needham
Robert A. Izard
Mark P. Kindall
Oren Faircloth
29 South Main St., Suite 305
West Hartford, CT 06107
(860) 493-6292
(860) 493-6290 (fax)
dneedham@ikrlaw.com
rizard@ikrlaw.com
mkindall@ikrlaw.com
ofaircloth@ikrlaw.com

***Lead Counsel for Plaintiff***